**CHESHIRE MEDICAL CENTER, Plaintiff**

v.

**W.R. GRACE & CO. and W.R. Grace & Co.—Conn., Defendants.**

**No. CV–88–516–M.**

United States District Court, D. New Hampshire.

May 24, 1994.

Daniel A. Speights, Hampton, SC, Michael P. Hall, Manchester, NH, for plaintiff.

Richard V. Wiebusch, Manchester, NH, Harry T. Daniels, Boston, MA, for defendants.

### *ORDER*

McAULIFFE, District Judge.

Plaintiff Cheshire Medical Center ("Cheshire") sued W.R. Grace & Co. and W.R. Grace & Co.–Conn. (collectively "W.R. Grace") for damage to its building allegedly resulting from the installation of asbestos-containing fireproofing manufactured and supplied by defendant. Cheshire sought recovery under three theories of liability: negligence, strict liability, and breach of implied warranty. After an eighteen day trial, the jury returned a verdict for defendant on all three counts.

Cheshire now moves for a new trial, asserting evidentiary errors and errors in the jury charge.

### I. Standard of Review

A motion for a new trial will be granted if a court has committed an error that adversely affects the moving party's substantial rights. Fed.R.Civ.P. 61; *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553–54, 104 S.Ct. 845, 848–49, 78 L.Ed.2d 663 (1984). Harmless error is not grounds for a new trial. Fed.R.Civ.P. 61.

### II. Jury Instructions

#### A. Strict Liability Failure to Warn

Cheshire's soundest claim relates to the court's failure to specifically instruct on defendant's "duty to warn" relative to Cheshire's strict liability theory. The court instructed the jury that W.R. Grace's failure to warn of any foreseeably dangerous uses of its product would constitute a breach of a duty owed to the plaintiff under the law of negligence. However, the court did not specifically instruct the jury that W.R. Grace's failure to warn could also render its fireproofing

product unreasonably dangerous for purposes of strict liability. Cheshire argues that the court's omission of a failure-to-warn instruction on its strict liability count amounted to prejudicial error requiring a new trial.[1]

■ In this diversity case, consideration of Cheshire's assertion of error necessarily begins with a review of applicable New Hampshire law. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). New Hampshire's strict liability law is different from that of many other jurisdictions that have adopted section 402A of the *Restatement (Second) of Torts.* Here, strict liability does not mean "liability without fault." *Simoneau v. South Bend Lathe, Inc.,* 130 N.H. 466, 469–70, 543 A.2d 407, 409 (N.H.1988); *Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 806, 395 A.2d 843, 845–46 (N.H.1978). New Hampshire explicitly rejects the view that strict liability should serve as a no-fault compensation system or a means for spreading risk in society. *Thibault,* 118 N.H. at 806, 395 A.2d at 845–46. Rather, in this state strict liability actions are limited to claims arising from defective products where requiring a plaintiff to prove negligence would pose "a practical barrier to otherwise meritorious claims." *Bagley v. Controlled Environment Corp.,* 127 N.H. 556, 560, 503 A.2d 823, 826 (N.H.1986); *see also Buttrick v. Arthur Lessard & Sons, Inc.,* 110 N.H. 36, 39, 260 A.2d 111, 113 (N.H.1969).

■ Under New Hampshire's law of products liability, "[t]he duty to warn is part of the general duty to design, manufacture, and sell products that are reasonably safe for their foreseeable uses." *Chellman v. Saab–Scania AB,* 138 N.H. 73, 78, 637 A.2d 148, 150 (N.H.1993). If the design of a product makes a warning necessary to avoid an unreasonable risk of harm from a *foreseeable* use, the lack of warning (or an inadequate warning) is sufficient to make the product defective and unreasonably dangerous. *See id.* (citing Restatement (Second) of Torts § 402A, cmts. h and j); *see also Thibault,* 118 N.H. at 808, 395 A.2d at 846–47. This

---

1. If prejudicial error, relief would presumably extend only to granting a new trial on the strict liability count.

duty to warn "is limited to foreseeing the probable results of the normal use of the product or a use that can reasonably be anticipated." *Thibault*, 118 N.H. at 808, 395 A.2d at 847 (quoting *McLaughlin v. Sears, Roebuck & Co.*, 111 N.H. 265, 268, 281 A.2d 587, 588 (N.H.1971)). A manufacturer is not required to warn against obvious dangers or absurd uses of a product because "individual consumers have certain responsibilities" to avoid unreasonable and unintended uses of a product. *Id.*

In *Chellman v. Saab–Scania AB, supra,* the New Hampshire Supreme Court held that a trial judge's refusal to give a failure-to-warn instruction on plaintiff's strict liability claim for defective design was reversible error. The jury in that case had been instructed on the general rule of strict liability for design defects, but "the charge did not explain that the jury could consider whether failure to warn of a foreseeable danger made the product defective." *Chellman*, 138 N.H. at 79, 637 A.2d at 151. Although the jury found by special verdict that the product contained no design defects which would make it unreasonably dangerous, the supreme court held that "[c]onsideration of a warning, or lack thereof, *as part of the analysis of design defect,* is not obvious to a jury and must be explained through proper instruction...." *Id.* (emphasis added). Because the jury instructions in *Chellman* "could have misled the jury as to the proper considerations for determining design defect," the trial court's failure to instruct on the manufacturer's duty to warn could not be deemed harmless error. *Chellman*, 138 N.H. at 80, 637 A.2d at 152.

In this case, Cheshire advanced two related claims: It alleged (1) that W.R. Grace's failure to place a warning on its fireproofing product was negligent, and (2) that the absence of a warning also rendered the fireproofing unreasonably dangerous. The court instructed the jury on plaintiff's negligence claim, in part, as follows:

In determining whether or not the defendant was negligent you must consider whether the defendant breached any duties owed to the plaintiff.

1. Duty to Warn

If the defendant knew or should have known that the fireproofing it sold to the plaintiff was dangerous to people or that it would damage property, the defendant had a duty in the exercise of reasonable care to inform purchasers of the fireproofing of that danger. The defendant had a continuing duty to warn the plaintiff of dangers associated with the fireproofing even after the sale of the fireproofing to the plaintiff if the defendant discovered after the sale that the product was defective or dangerous.

2. Duty to Acquire Knowledge

The defendant, as a manufacturer, had a duty to be aware of available scientific knowledge concerning the health hazards associated with the asbestos contained in its fireproofing. Manufacturers are presumed to possess the skill and knowledge of experts in their business, and to possess expert knowledge concerning the materials and processes available to the industry.

3. Duty to Test for Defects

The defendant had a duty to use reasonable care to test its product to discover any latent or hidden defects. The defendant had a duty to test its fireproofing to see if it would release hazardous asbestos fibers during normal and foreseeable conditions of building use and maintenance.

Jury Instructions (Court Exhibit no. 2) at 16–17. The strict liability charge included the following instruction:

2. Unreasonably Dangerous Condition

A product is unreasonably dangerous if it poses a danger to an extent beyond that which may be contemplated by the ordinary consumer who purchases it, and who possesses the degree of knowledge as to its characteristics common to the community of persons intended to purchase and use the product.

In deciding whether the fireproofing product presents an unreasonable danger, you should consider the desirability and usefulness of the product to the public as a whole. Even if you decide that the fireproofing is desirable and useful to the public as a whole, consider whether the risk of unreasonable danger could have been re-

duced without significant impact on the effectiveness of the product and the cost of manufacturing; liability may exist if the manufacturer, W.R. Grace, did not take available and reasonable steps to lessen or eliminate the danger of even a useful and desirable product. A manufacturer is not obliged to design the safest possible product, or a safer product, or one as safe as others make, so long as the product it designed is not unreasonably dangerous.

Jury Instructions (Court Exhibit no. 2) at 19–20.

■ As noted, if a defendant's failure to warn is properly at issue in a strict liability design defect case, *Chellman* requires that the jury be instructed specifically on that point. Here W.R. Grace argues that this court's instruction directing the jury to consider whether defendant could have taken any "available and reasonable steps to lessen or eliminate the danger" posed by its product adequately informed the jury of the appropriate considerations, including whether the absence of a warning rendered the fireproofing product defective. The court respectfully disagrees.

The *Chellman* decision emphasized the possibly confusing or misleading aspects of a general instruction on defective design. The "available and reasonable steps" language of the strict liability instruction given in this case did little if anything to explain how a "non-obvious" duty to warn might relate to the issue of design defect. Because the instruction given did not specifically inform the jury that the manufacturer's failure to warn could be relevant to the existence of an unreasonably dangerous design defect, *Chellman* compels the conclusion that the court's omission of a strict liability failure-to-warn instruction in this case was indeed error. Plaintiff's counsel properly preserved the issue by timely objection. Accordingly, Cheshire is entitled to a new trial, on the strict liability count, if the error affected its substantial rights.

In general, negligence and strict liability causes of action derive from distinct theories. Negligence focuses on the defendant's conduct, while strict liability focuses on the defendant's product. With respect to a manufacturer's failure to warn of a product's dangers, however, the distinction between negligence and strict liability is less apparent. Some courts have found no material distinction between the two causes of action where the strict liability duty to warn involves primarily negligence principles. *See, e.g., Kotler v. American Tobacco Co.,* 926 F.2d 1217, 1231 (1st Cir.1990) (applying Massachusetts law), *vacated,* —— U.S. ——, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992), *reaff'd on remand,* 981 F.2d 7 (1st Cir.1992); *Werner v. Upjohn Co.,* 628 F.2d 848, 858 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981); *Gonzalez v. Volvo of America Corp.,* 752 F.2d 295, 300 (7th Cir. 1985) (per curiam) (applying Indiana law); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 466 (7th Cir.1984) (applying Wisconsin law).

In *Kotler v. American Tobacco Co., supra,* the plaintiff brought claims for negligence and breach of warranty[2] based on defendant's alleged failure to warn of dangers associated with smoking cigarettes. In that case the trial court directed a verdict in defendant's favor on the warranty claim, and the jury subsequently returned a verdict for the defendant on the negligence claim. On review, the Court of Appeals for the First Circuit held that the trial court erred in directing a verdict on the warranty claim, but, despite the error, a new trial was not warranted. *Kotler,* 926 F.2d at 1228, 1235. The Court determined that, under Massachusetts law, the only difference between the duty to warn under warranty and negligence theories is the level of knowledge attributed to a manufacturer: in warranty, the manufacturer is held to possess the knowledge of an expert and not simply, as in negligence, that of an ordinary, reasonable person. *Kotler,* 926 F.2d at 1232; *but see Simmons v. Monarch Machine Tool Co.,* 413 Mass. 205,

**2.** Massachusetts law does not provide for causes of action based on strict liability. However, warranty actions in Massachusetts are analogous to and coextensive with strict liability actions in other jurisdictions that have adopted § 402A of the Restatement. *See Allen v. Chance Manufacturing Co.,* 873 F.2d 465, 466 n. 2 (1st Cir.1989); *Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 355, 446 N.E.2d 1033, 1039 (1983).

207 n. 3, 596 N.E.2d 318, 320 n. 3 (Mass.1992) (clarifying Massachusetts law concerning relevance of vendor's state of knowledge in warranty action).

The trial court in *Kotler* instructed on the negligence duty to warn, but mistakenly directed the jury to hold the defendant to the more demanding standard of expert knowledge associated with the warranty duty. Had the court instructed on the plaintiff's warranty claim, the jury would have been asked to apply that same standard of knowledge in determining warranty liability. The Court of Appeals concluded that the plaintiff in *Kotler* had not been prejudiced by the trial court's erroneous disallowance of the warranty claim because the jury's verdict for the defendant on the negligence claim presupposed an identical and consistent finding for the defendant on the warranty theory. *Kotler*, 926 F.2d at 1235. In other words, because the jury found no breach of the higher warranty duty to warn (albeit in the context of a negligence claim), such a finding would have necessarily precluded a verdict for the plaintiff on a warranty claim.

▪ Under New Hampshire law, the strict liability duty to warn requires only that a manufacturer warn of *foreseeable* dangers associated with the normal or *foreseeable* use of its product. *See Chellman*, 138 N.H. at 78, 637 A.2d at 150; *Thibault*, 118 N.H. at 808, 395 A.2d at 846–47. "Foreseeability" is a negligence principle, determined by reference to what the manufacturer knew or should have known at a particular time. New Hampshire has yet to hold a manufacturer to a heightened state of knowledge concerning the dangers associated with its product. *Cf. Kotler*, 926 F.2d at 1232 (discussing "expert" and "perfectly developed"

states of knowledge). A product may be unreasonably dangerous in the absence of a warning, but in New Hampshire a manufacturer is not strictly liable for failing to warn of the danger unless that danger is foreseeable. Issues of causation and harm being identical, under New Hampshire law the strict liability duty to warn appears to be indistinguishable from the negligence duty to warn.[3]

▪ In this case, the jury instructions regarding Cheshire's negligence claim included a full explanation of the duty to warn. The negligence instructions also required the jury to hold the defendant to a standard of expert knowledge "concerning the health hazards associated with the asbestos contained in its fireproofing ... and the materials and processes available to the industry." Jury Instructions, *supra*. The jury was further instructed that "[t]he defendant had a duty to test its fireproofing to see if it would release hazardous asbestos fibers during normal and foreseeable conditions of building use and maintenance." *Id.*[4]

Relying on these instructions, the jury found that W.R. Grace's failure to include a warning on its fireproofing did not constitute a breach of the negligence duty to warn of foreseeable dangers. Because the duty to warn relative to strict liability is identical to the duty to warn under negligence, and all other matters were resolved against plaintiff, the jury's verdict on the negligence count necessarily precluded a finding in plaintiff's favor with respect to the strict liability duty to warn. Accordingly, although it was error not to do so, Cheshire was not prejudiced by the court's omission of a failure-to-warn instruction relating to strict liability.[5]

---

3. A strict liability failure-to-warn instruction was not included in the proposed jury instructions submitted to the court. *See* Plaintiff's Proposed Jury Instructions (document no. 151). Cheshire's counsel requested such an instruction for the first time at sidebar after the charge had been given to the jury, but did not suggest a particular formulation of the charge. Transcript, Nov. 2, 1993, at 110–11. In the absence of a proposed instruction from plaintiff, the court's own strict liability failure-to-warn instruction would have likely closely resembled the negligence duty-to-warn instruction had the court properly charged

the jury on this issue following Cheshire's objection.

4. By contrast, the jury charge in *Chellman* contained no references whatsoever to a duty to warn under any theory of liability.

5. It may be worth noting that if it was reasonable (i.e., not negligent) for W.R. Grace not to place warnings on its product (as the jury determined), then any unreasonable danger that existed would appear to concern simply a deficiency in the design itself. *See Brochu v. Ortho Pharmaceuti-*

## B. Duty to Warn Standard

■ Cheshire also objects to the negligence duty-to-warn instruction given by the court. The jury was instructed that W.R. Grace had a duty to warn if it "knew or should have known that the fireproofing it sold to the plaintiff was dangerous to people or that it would damage property."[6] Jury Instructions (Court Exhibit no. 2) at 16. Cheshire insists that the court should have instructed that reasonable care required W.R. Grace to warn purchasers if and when it knew or should have known that its product "might be dangerous."

The standard Cheshire advocates lacks support in New Hampshire law. In *Thibault v. Sears, Roebuck & Co., supra,* the New Hampshire Supreme Court held that a manufacturer need not warn of all potential and speculative dangers associated with its product. *Thibault,* 118 N.H. at 808, 395 A.2d at 846–47 (manufacturer need not warn of known, but very unlikely, risk of danger). As discussed above, the duty to warn is limited under New Hampshire law to foreseeable dangers arising from foreseeable uses of the product.

The scope of a manufacturer's duty to warn is a function of its concomitant duties to acquire knowledge about the product and to test the product for defects. "Foreseeability"—i.e., what a manufacturer "knew or should have known" about the dangers of its product—is substantially determined by the knowledge a manufacturer "should have" acquired, and the tests it "should have" conducted. The instruction given by the court stated that W.R. Grace had a duty to warn of all dangers of which it knew or should have known. Subsequent instructions stated that W.R. Grace was deemed to possess the knowledge of an expert and was required to

have adequately tested its fireproofing for non-obvious defects. According to these instructions, if the available scientific knowledge and testing had not revealed a particular danger, then the jury could not conclude that W.R. Grace "should have known" of such a danger or that it had a duty to warn consumers about it.

Cheshire argues that the instruction given mistakenly informed the jury that W.R. Grace was only required to warn of dangers that were "certain." This argument misses both the import of the court's instruction and the meaning of the word "danger." Something is "dangerous" if it has the *potential* to cause harm. A dangerous product is one that poses a *possibility* or *risk* of harm, rather than a certainty of harm. By comparison, something "might be dangerous" if it *possibly* could have the *potential* to cause harm.

The jury in this case was not instructed that W.R. Grace had a duty to warn only of dangers that are "certain." Rather, the instruction imposed on W.R. Grace the duty to warn of *foreseeable risks of harm* to people or property—that is, "dangers" of which it "knew or should have known."[7] If it had been given, Cheshire's "might be dangerous" instruction would have erroneously implied that W.R. Grace was required to warn of all possible dangers, whether foreseeable or not. As has been discussed, New Hampshire law does not require a manufacturer to warn against such speculative risks. The court's instruction properly directed the jury's attention to those dangers that were foreseeable.[8]

## C. Other Alleged Errors

Cheshire's final objections to the jury charge concern the court's failure to instruct

---

cal Corp., 642 F.2d 652, 657 n. 6 (1st Cir.1981). Of course, the jury in this case also found that the design was neither defective nor unreasonably dangerous.

**6.** The jury instructions defined "property damage" as a release of respirable asbestos fibers posing an unreasonable health risk. Jury Instructions (Court Exhibit no. 2) at 14.

**7.** The instructions cited by plaintiff from *Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir.1981), and *Greenville v. W.R. Grace & Co.,*

827 F.2d 975 (4th Cir.1987), are consistent with this analysis. *See* Plaintiff's Motion for a New Trial at 9.

**8.** This instruction is consistent with the "continuing duty-to-warn" instruction proposed by Cheshire which requires W.R. Grace to warn of any dangers that it "discovered" after the sale of the fireproofing. *See* Plaintiff's Proposed Jury Instructions No. 28; Jury Instructions (Court Exhibit no. 2) at 16.

on the New Hampshire statutes governing asbestos exposure levels as well as its failure to inform the jury that W.R. Grace's fireproofing must inevitably be removed from Cheshire's building.

■ The court specifically instructed the jury that the various state and federal statutes and regulations applicable to asbestos-containing material could not be considered in determining W.R. Grace's liability, but were relevant only to the nature and extent of plaintiff's damages. Jury Instructions (Court Exhibit no. 2) at 38–41. *See, e.g., Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.*, 959 F.2d 868 (10th Cir.1992). Cheshire did not object to the court's instructions on this point. *See* Transcript, Nov. 2, 1993, at 107–31. Having decided the issue of liability in defendant's favor, the jury of course never reached the issue of damages. Consequently, even if error, plaintiff could not have been prejudiced by the court's omission of specific instruction on New Hampshire's statutes.

■ Cheshire also objects to the court's failure to instruct the jury that the federal NESHAP regulations required all of the asbestos-containing fireproofing to be removed upon demolition of the building and that such demolition was "inevitable." As an initial matter, the court did instruct the jury that the NESHAP regulations, about which the jury heard extensive testimony, "apply only when a certain amount of asbestos-containing material is disturbed or when a building containing such material is demolished." Jury Instructions (Court Exhibit no. 2) at 39. Consistent with its instructions concerning the requirements of other regulations, the court permitted the jury to decide, based on the evidence, whether the building would in fact be demolished: "It is for you, as the finders of fact in this case, to decide what

methods of dealing with the Monkote–3 fireproofing are reasonable under the circumstances and to calculate damages accordingly." *Id.* at 38. The jury was further instructed that if W.R. Grace were found liable for damages, Cheshire was entitled "to recover an amount that will fairly compensate it for all reasonable costs incurred to date or to be incurred in the future, in relation to the management, control, repair, or *removal* of the asbestos-containing fireproofing in its building." *Id.* (emphasis added).[9] In any event, this objection, too, is relevant only on the damages issue, which the jury never reached. Because the jury never reached the question of the "inevitability" of the fireproofing's removal, Cheshire could not have been prejudiced.

## III. Evidentiary Rulings

### A. Fed.R.Evid. 611(b)

Cheshire next argues that the court improperly allowed W.R. Grace to question Cheshire witnesses during its case-in-chief relative to Grace's statute of limitations defense. Citing Fed.R.Evid. 611(b), Cheshire complains that defendant's "open cross" of its witnesses "allowed Grace to improperly divert the jury's attention away from Cheshire's case-in-chief and toward Grace's statute of limitations defense, forcing Cheshire to reshape its own case and to anticipate and defend against an issue that was prematurely allowed into evidence." Plaintiff's Motion for a New Trial at 20. This contention lacks merit.[10]

Rule 611(b) is clear:

Cross-examination *should* be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court *may*, in the exercise of

9. That *demolition* of this building is "inevitable" is not entirely free from doubt. *But see Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 982 (4th Cir.1987). The building may be demolished twenty, fifty, or even one hundred years from now, or it may remain standing until time and decay reduce it to rubble. Mr. Frazier, the safety officer at Cheshire Medical Center, testified at trial that there were no current plans to demolish the building, and he declined to estimate the probable life of the building. *See* Transcript,

Oct. 18, 1993 a.m. at 41–42. On such evidence, the jury would have had no basis for calculating the present value of the removal costs upon demolition at some unspecified future date.

10. Cheshire prevailed on the statute of limitations defense, so it was not directly prejudiced as to that matter. Cheshire argues, however, that the court's ruling prejudiced its liability case.

discretion, permit inquiry into additional matters as if on direct examination.

Fed.R.Evid. 611(b) (emphasis added). This general directive is suggestive rather than mandatory, and is subject to a trial judge's discretion regarding the proper scope of questioning. *See* Fed.R.Evid. 611(b), Advisory Committee's Note (citing cases). The Court of Appeals for this circuit has consistently recognized the broad discretion accorded trial judges in determining the scope of cross-examination. *See Losacco v. F.D. Rich Constr. Co.,* 992 F.2d 382, 385 (1st Cir.) ("Of course, trial judges, within their discretion, may disregard Rule 611(b)."), *cert. denied,* — U.S. —, 114 S.Ct. 324, 126 L.Ed.2d 270 (1993); *United States v. Akitoye,* 923 F.2d 221, 225 (1st Cir.1991) (citing the "broad discretion accorded to federal trial judges in delimiting the scope of cross-examination"); *United States v. Keithan,* 751 F.2d 9, 11 (1st Cir.1984) ("It is axiomatic that the trial court is given wide discretion in controlling the scope of cross-examination."). Subdivision (a) of Rule 611 describes considerations relevant to the court's exercise of this discretion:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Fed.R.Evid. 611(a).

Cheshire's protestations notwithstanding, W.R. Grace was not allowed to conduct "open cross" of plaintiff's witnesses (i.e., cross-examination regarding any matter relevant to any issue in the case). In response to Cheshire's objection that W.R. Grace's anticipated cross-examination would cause extensive delay and would prejudice Cheshire's case, the court ruled as follows:

> I have no intention, Mr. Speights, of allowing the defendants to use the cross-examination to put their case in and charge you with that time. I'm going to charge that time to the defendants.

> But I think in ordering the proof and managing the trial in the most efficient way and the most comprehensible way for the jury, it makes sense to allow the defendants to cross-examine on the issue of statute of limitations, because it's a defense you are aware of. It's been moved on summary judgment at least twice that I'm aware of. It's not a surprise. All the witnesses are aware of it. To have the witnesses testify, limit cross, and then bring them back in the defendants' case is just an inefficient and ineffective use of resources.

Transcript, Oct. 8, 1993 a.m. at 56. The court further clarified this ruling by admonishing W.R. Grace's counsel not to "attempt to convert the witness to an expert for the defense." *Id.* at 106.

> In other words, I can't tell, Mr. Daniels, where you are going sometimes. If you are eliciting from him factual matters within his knowledge that reflect on some evidence later that you are going to tie into [what] they should have known in the 1970's, that's fine. But I don't want you to ask this witness if he has an opinion as to whether building owners, for example, in the 1970's should reasonably have known that asbestos in buildings posed a contaminant hazard.

*Id.* at 106–07. Thus, the court limited cross-examination to matters relating to the statute of limitations issue within the witness's knowledge and not to any other relevant matters.

■ The trial in this case lasted several weeks and involved many fact and expert witnesses. The parties' multiple theories of liability and defense compounded the complexity of the case, requiring the jury to apply difficult legal principles to complicated, often technical, evidence. Under these circumstances, the court finds that it was within its discretion to permit inquiry beyond the traditional strictures of cross-examination. In addition to promoting efficiency, the court's ruling was designed to facilitate the jury's comprehension of the evidence, without compromising effective presentation.

*See supra.*[11]

Dicta cited by Cheshire from *MDU Resources Group, d/b/a Montana–Dakota Utilities Co. v. W.R. Grace & Co.*, 14 F.3d 1274 (8th Cir.1994), does not compel a different view. In that case, the trial judge contradicted a prior ruling and actively encouraged the defendant to explore its statute of limitations defense during the plaintiff's case-in-chief. Reversing the verdict for the defendant (on other grounds), the Court of Appeals for the Eighth Circuit remarked "by way of guidance" that "although the scope of cross-examination is within the discretion of the trial court, it should not be allowed to get out of hand." *MDU Resources*, 14 F.3d at 1282. It appears from the appellate court's characterization of the record in that case, and from Cheshire's own representations to this court about the *MDU Resources* trial, *see* Transcript, Oct. 8, 1993 a.m. at 49, 55 (describing extensive delay resulting from "open cross"), that the cross-examination allowed here did not approach the broad inquiry which "[got] out of hand" in *MDU Resources*.[12]

*Lis v. Robert Packer Hospital*, 579 F.2d 819 (3rd Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 354, 58 L.Ed.2d 346 (1978), another case relied upon by Cheshire, is also distinguishable. The district judge in that case apparently permitted "open cross" as a general rule in *every* case, unless circumstances required otherwise. The Court of Appeals for the Third Circuit criticized that practice, emphasizing that Rule 611(b)

> does not confer upon a federal judge "the right to permit inquiry beyond the scope of the direct ... in every case." Rather, the general prescription is precisely the opposite. Any right to counter the stated procedure is granted to the trial court only "in the exercise of discretion." To follow the practice announced by the trial judge in

this case is not to exercise discretion; it is to use no discretion whatever.

*Lis*, 579 F.2d at 823. By contrast, the court's ruling on cross-examination here did not manifest a general practice, but constituted an exercise of discretion based on reasons unique to this particular case.

The question of discretion aside, examination of the record reveals that most of the cross-examination questions to which Cheshire objected on this ground actually fell within the scope of direct examination and did not implicate Fed.R.Evid. 611(b). In its motion for a new trial Cheshire specifically objects only to W.R. Grace's cross-examination of William Ewing, one of Cheshire's experts who testified during its case-in-chief and on rebuttal. Mr. Ewing, an industrial hygienist, testified as an expert regarding asbestos contamination of buildings and federal and state regulation of asbestos management and removal activities. During his initial cross-examination, counsel for W.R. Grace asked questions which, although relevant to the statute of limitations issue, also probed the witness's qualifications as an expert and the bases for his opinions, inquiry properly within the scope of direct examination. *See* Transcript, Oct. 8, 1993 a.m. at 91–92, 99–100, 167. Cheshire's other objections were either sustained by the court, *see id.* at 93, 111, or rendered moot due to Mr. Ewing's inability to answer the question, *see id.* at 114. Similarly, during cross-examination on rebuttal, Mr. Ewing either did not answer the allegedly objectionable question, *see* Transcript, Nov. 1, 1993 a.m. at 74, or the question properly concerned the bases for his opinion about the contamination of plaintiff's building, *see id.* at 75–77.

In these circumstances, Cheshire's assertions of "severe prejudice" from being "forced" to alter its "normal and successful

---

11. Early in this litigation the *defendant*, W.R. Grace, moved to bifurcate the trial so that the statute of limitations issue could be tried separately. *See* document no. 69. Although bifurcation would have eliminated Cheshire's current complaint, Cheshire objected strenuously to bifurcation, *see* document no. 72, and the motion was denied.

12. The Eighth Circuit Court of Appeals further cautioned that when cross-examination goes beyond the scope of direct, the examiner must not ask leading questions of a non-hostile witness. *MDU Resources*, 14 F.3d at 1282. In this case, Cheshire does not object to the form of questions posed by counsel for W.R. Grace, nor did it make such an objection at trial. Cheshire confines its objections to the scope of cross-examination, not the mode of questioning.

strategy" lack merit. Cheshire has not demonstrated that it was prejudiced or that it is entitled to a new trial. *See Lis,* 579 F.2d at 824–25.

### B. Videotape

Cheshire argues that it is entitled to a new trial because the court improperly excluded a videotape offered to rebut the testimony of defendant's witnesses, Thomas Feit and Richard Lee. The videotape showed the fireproofing in Cheshire's building being brushed with a toothbrush, purporting to illustrate the friable nature of the material. The tape was recorded on October 27, 1993, while trial was in progress and without notice to W.R. Grace. It was offered in evidence five days later on November 1, 1993, along with the testimony of Mr. Ewing to explain it. The court excluded the videotape on grounds that it was cumulative evidence. Transcript, Nov. 1, 1993 a.m. at 33–34.

 Evidence may be introduced on rebuttal only to refute new facts brought out during the defendant's case-in-chief. *See Morgan v. Commercial Union Assurance Cos.,* 606 F.2d 554, 555 (5th Cir.1979). What constitutes proper rebuttal evidence is a matter committed to the discretion of the trial judge. *See Lubanski v. Coleco Industries, Inc.,* 929 F.2d 42, 47 (1st Cir.1991).

During its case-in-chief, the court afforded Cheshire wide latitude in demonstrating the fireproofing's friability to the jury. Using a toothbrush and tongue depressor, Mr. Frazier showed the jury how fireproofing attached to a section of beam, which had been removed from plaintiff's hospital, broke down and presumably released fibers when disturbed. Transcript, Oct. 19, 1993 a.m. at 15–18. 63–67. Cheshire did not offer the beam in evidence.

After one of defendant's experts, Dr. Richard Lee, criticized that demonstration as unrepresentative of the material's characteristics, Transcript, Oct. 29, 1993 a.m. (I) at 10–11, the court allowed Cheshire to introduce bulk samples of fireproofing taken from its

facility. Dr. Lee agreed that a more representative illustration of friability could be obtained using these samples. *Id.* at 37, 47–58; Transcript, Oct. 29, 1993 a.m. (II) at 5, 13–14. The jury was permitted to see and handle the bulk samples, under appropriate precautions.

Cheshire did not attempt to introduce a videotaped demonstration of friability during its case-in-chief, but argues that the tape was necessary on rebuttal in response to Thomas Feit's testimony that a videotape of the fireproofing intact in the hospital would provide the most representative demonstration of friability. The videotape was also expected to undermine Dr. Lee's remaining criticisms of the representative character of the bulk samples of fireproofing.

Cheshire's interpretation of the evidence is somewhat strained. The record shows that Mr. Feit testified only that a videotape would give the jury "a representation of what [the fireproofing] *looked like*" and that "[i]t would be like standing on the floor *looking up at it in person.*" Transcript, Oct. 25, 1993 a.m. at 7. He did not testify that the tape would be the best evidence of friability. In fact, both Mr. Feit and Dr. Lee testified that the best way to evaluate the friability of the fireproofing in a courtroom setting would be to remove a very large section of the material, including the beam, such that disturbance of the fireproofing at the center of the section would be minimized. *See* Transcript, Oct. 25, 1993 a.m. at 5–6 (Mr. Feit); Transcript, Oct. 29, 1993 a.m. (II) at 15 (Dr. Lee).

 Cheshire's proffered videotape was not proper rebuttal evidence because it did not counter any new evidence put forth by W.R. Grace. In any event, Cheshire introduced extensive evidence of the fireproofing's friability during its case-in-chief and during cross-examination of W.R. Grace's experts, rendering the videotape excludable on rebuttal as, at best, cumulative evidence of friability.[13]

---

13. *See also Fusco v. General Motors Corp.,* 11 F.3d 259 (1st Cir.1993) (exclusion of videotape demonstration where reenactment lacked sufficient similarity to accident at issue). Here it is

also questionable whether a videotape of someone scrubbing fireproofing material with a toothbrush (presumably, with varying degrees of pressure and vigor) is particularly probative of the

## IV. Conclusion

For the foregoing reasons, Cheshire's motion for a new trial (document no. 208) is denied.

SO ORDERED.

friable nature of the fireproofing relative to its release of asbestos fibers in the building during normal use and occupancy. While there was testimony about the possible bumping or banging of the fireproofing by maintenance personnel when working above the suspended ceiling, there was no evidence that anyone would likely be scrubbing it with any instrument like a tooth-brush. The issue of significance regarding friability was whether the material was like "cement" ("locking in" respirable fibers) or whether it was "crumbly" (unstable and likely to release respirable fibers). The evidence admitted was fully adequate to allow the jury to determine the question and any more, even if probative, would have been cumulative.